**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

JAMES P. COGAR,

      Plaintiff,

v.
                              **Civil Action No. 1:11CV76
                              (The Honorable Irene M. Keeley)**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant," and sometimes "Commissioner") denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 9.02

## I. Procedural History

Plaintiff filed application for SSI and DIB on May 8, 2008. In his SSI application, he alleged disability since January 1, 2008; in his DIB application, he alleged disability since July 1, 2007 (R. 139, 146). Plaintiff asserted he was unable to work due to back injury, high blood pressure and "heart," possible surgery on left elbow, breathing, depression, arthritis, migraine headaches, "left and right knee," high cholesterol, obesity, and "nerves" (R. 169). Plaintiff's applications were denied initially and upon reconsideration by the state agency (R. 80-83). Plaintiff timely requested a

hearing, which Administrative Law Judge Stephen R. Woody ("ALJ") held on April 20, 2010, and

at which Plaintiff, represented by counsel, Randall W. Galford, and Vocational Expert Larry Bell

("VE") testified (R. 33-74). On June 18, 2010, the ALJ entered a decision finding Plaintiff was not

disabled because he was capable of performing a range of light jobs, which were available in the

national and local economies (R. 11-27). Plaintiff requested review of the ALJ's decision by the

Appeals Council, which denied his request for review on March 31, 2011, making the ALJ's

decision the final decision of the Commissioner (R. 1-7).

## II. Statement of Facts[1]

Plaintiff was born on October 16, 1962, and was forty-seven (47) years old at the time of the

administrative hearing (R. 239, 139, 146). Plaintiff has a ninth grade education (R. 41).

Plaintiff's school record shows he was retained in the first grade despite having all

"satisfactory" grades except for reading (R. 240). He subsequently had all "satisfactory" grades

through fifth grade with the exception of one "unsatisfactory" in spelling in the third grade. By fifth

grade he had all "satisfactory" grades, and was performing at grade level in every subject listed. In

sixth, seventh, and eighth grades, however, he began receiving C's and D's. He was also absent 43-

44 days each of those three years. In the ninth grade, Plaintiff failed nearly every subject. He quit

school in the 10th grade "to take a job."

---

[1]Plaintiff's argument is limited to the ALJ's having erred only in not assessing Plaintiff's
mental capacity under Listing 12.05(c) (Plaintiff's brief at pp. 4-8). Plaintiff agrees with the
ALJ's findings as to his physical limitations; he noted the following: "The Administrative Law
Judge found a physical impairment, or several of them, which imposed additional and significant
work related limitation (sic) on function in addition to the plaintiff's mental impairments. The
Plaintiff agrees that these are significant limitations of function from physical problems"
(Plaintiff's brief at p. 5). The undersigned, therefore, only includes the evidence of record
relative to Plaintiff's intellectual functioning.

Plaintiff's cumulative test record for sixth grade, seventh month, noted in March, 1975, shows grade equivalent scores as follows: Abilities – non-verbal grade equivalent score 4.5, verbal grade score 4.6; Language Studies – reading grade score 4.7, English grade score, 4.5; Tech Studies – math grade score 4.9, science grade score 5.0; Social Studies – the USA grade score 4.9, solving problems grade score 5.5. Plaintiff's composite scores were as follows: battery composite was 4.3; total ability was 4.2; basic skills was 4.2. According to the testing service used, these scores mean Plaintiff, in the sixth grade, could do sixth-grade level work as well as the average fourth or fifth-grader could do the same work.[2] He performed better than 5 to 11% of students in his grade in his school or school district.[3]

Plaintiff's cumulative test record for the ninth grade, first month, recorded in October, 1977, showed he performed better than only 1% of students at his grade level nationally on verbal and better than 3% on non-verbal abilities; he performed better than 13% in reading vocabulary, 7% in reading comprehension, and 8% total reading. He performed better than 10% of students nationally at his grade level in language mechanics, 2% in language expression, and 4% at spelling, for 2% total language arts; he performed better than 38% of students nationally in mathematics computation, 7% in math concepts, and 3% in math applications for a total of better than 16% of students in math. In total, he performed better than 6% of students in his grade nationally in basic skills. Plaintiff performed better than only 1% in reference skills, better than 7% nationally in science, and better than 17% nationally in social studies.[4]

---

[2] http://www.ststesting.com/explainit.html (November 4, 2011).

[3] Id.

[4] Id.

3

On February 13, 2008, a Social Summary Outline was completed of Plaintiff by the West Virginia Department of Health and Human Resources Medical Review Team (MRT). It was noted that Plaintiff was literate (R. 327).

On May 27, 2008, J.R. Davis of the West Virginia Department of Health and Human Resources Medical Review Team (MRT) completed a Social Summary Outline of Plaintiff. It was noted that Plaintiff was literate and had completed the ninth grade of school (R. 299, 302). Plaintiff was listed as "stable" in his home environment and needed no assistance in performing his activities of daily living (R. 302).

On June 11, 2008, Dr. Lois Urick completed a psychiatric evaluation of Plaintiff. Plaintiff reported he had been depressed and anxious for the past year or so due to his divorce and ongoing pain in his arm (R. 483). Dr. Urick, upon examination, noted Plaintiff "exhibit[ed] good dress/grooming/hygiene, ha[d] good eye contact and no psychomotor abnormality. Manner is appropriate." Plaintiff's affect was mildly blunted; his mood was described as "'not too bad.'" Plaintiff's speech was within normal limits as to tone, rate, and content. His thoughts were goal oriented; there was no evidence of delusions. Plaintiff's attention, concentration, and impulse control were intact; his sensorium was clear. Plaintiff's cognition appeared to be intact; his intelligence was estimated as "somewhat below average." Plaintiff's remote and recent memories were grossly intact. Plaintiff's insight was partial; his judgment was good. Dr. Urick diagnosed depressive disorder, NOS, and anxiety disorder, NOS. Dr. Urick noted that borderline intellectual functioning and mild mental retardation needed to be ruled out. Dr. Urick prescribed amitriptyline and encouraged Plaintiff to participate in individual therapy (R. 484).

On June 30, 2008, Larry J. Legg, M.A., completed a Mental Status Examination of Plaintiff;

he completed the report on July 6, 2008. Plaintiff had a valid West Virginia driver's license (R. 346). Plaintiff reported he had a normal childhood. He quit school in the ninth grade "to take a job." Plaintiff was married for thirteen (13) years and had a sixteen (16) year old daughter. Plaintiff reported medicating with Diazepam and Amitriptyline. He reported depression and "bad nerves" (R. 347). Plaintiff stated that pain caused his "nerves" to get worse, which caused him to be forgetful (R. 348). Plaintiff was a heavy equipment operator from January 2006 to July 2007; he formerly worked as a logger (R. 349).

Upon examination, Dr. Legg noted Plaintiff was cooperative and polite. He was fully oriented. His speech was normal, mood was dysphoric, affect was flat, insight was fair, concentration was normal, persistence was normal, judgment was normal, and pace was mildly deficient. Plaintiff's thought content and thought process were normal. Plaintiff's immediate memory was normal; his recent memory was moderately deficient; his remote memory was mildly deficient. Plaintiff's social functioning was moderately deficient; he "displayed very infrequent eye contact" during the evaluation (R. 349). Mr. Legg diagnosed adjustment disorder with mixed anxiety and depressed mood, chronic. He noted that the diagnosis was "being made based on [his] interview with the claimant . . . . [Plaintiff] report[ed] that he ha[d] developed emotional symptoms in response to the psychological stress of his medical problems and inability to work. [Plaintiff] claim[ed] his symptoms caused marked distress and significant impairment in his social and occupational functioning. The predominant manifestation [was] a combination of symptoms of depression and anxiety" (R. 350). Mr. Legg found Plaintiff could manage his own finances (R. 350-51).

On July 9, 2008, Plaintiff presented to Dr. Urick for medication management. Plaintiff informed Dr. Urick that amitriptyline caused him to be sleepy; he medicated with Cymbalta and it

was well tolerated. Dr. Urick noted Plaintiff "exhibit[ed] good dress/grooming/hygiene, ha[d] good eye contact, and exhibit[ed] no psychomotor abnormality." Plaintiff's manner was appropriate; his affect was mildly blunted; his mood was described as "'not too bad.'" Plaintiff's speech was normal as to rate, tone and content. His thoughts were goal directed; he was not delusional. His attention, concentration, and impulse control were intact; his sensorium was clear. Plaintiff's cognition was intact; his insight was partial; his judgment was good. Dr. Urick diagnosed depressive and anxiety disorders, NOS, but again noted that borderline intellectual functioning and mild mental retardation needed to be ruled out. Dr. Urick prescribed Cymbalta (R. 480).

On August 6, 2008, Plaintiff presented to Dr. Urick for medication management. Plaintiff informed Dr. Urick that Cymbalta had "been helpful and denie[d] any side effects." Dr. Urick noted Plaintiff "exhibit[ed] good dress/grooming/hygiene, ha[d] good eye contact, and exhibit[ed] no psychomotor abnormality." Plaintiff's manner was appropriate; his affect was euthymic; he mood was described as "'pretty good.'" Plaintiff's speech was normal as to rate, tone and content. His thoughts were goal directed; he was not delusional. His attention, concentration, and impulse control were intact; his sensorium was clear. Plaintiff's cognition was intact; his insight was partial; his judgment was good. Dr. Urick diagnosed depressive and anxiety disorders, NOS, but again noted that borderline intellectual functioning and mild mental retardation needed to be ruled out. Dr. Urick prescribed Cymbalta (R. 481).

On August 25, 2008, Mr. Legg completed an Adult IQ assessment of Plaintiff, which included the Wechsler Adult Intelligence Scale, Third Edition ("WAIS-III") and the Wide Range Achievement Test, Third Edition ("WRAT-3"). Plaintiff scored as follows on the WAIS-III: verbal IQ, 64; performance IQ, 80; full scale IQ, 69 (R. 353). Plaintiff's verbal comprehension was 63, his

perceptual organization was 86, and his working memory was 59. Mr. Legg noted Plaintiff "put forth diligent effort on the test items." He observed that there "was a significant difference between [Plaintiff's] verbal and performance IQ's." Plaintiff's full scale IQ of 69 placed him, according to Mr. Legg, in the "Extremely Low range of general intellectual functioning." Mr. Legg noted Plaintiff had "reported no significant deficits in his adaptive behavior during the developmental period." Finally, Mr. Legg opined that "[u]sing the 95% Confidence Interval, [Plaintiff's] true Full Scale IQ score [would] likely fall somewhere between 66 and 74. We believe, based on our previous mental status examination, completed on June 30, 2008, and report dated July 6, 2008, that he is most accurately described as functioning in the Low Borderline range of general intellectual functioning" (R. 354).

Plaintiff scored as follows on the WRAT-3: reading was second grade level; spelling was first grade level, arithmetic was third grade level. Mr. Legg found the results were valid and opined that Plaintiff was "markedly deficient [in] functional academics" (R. 354-55).

On September 23, 2008, State agency reviewing psychologist James W. Bartee, Ph.D., completed a Mental Residual Functional Capacity Assessment of Plaintiff. Dr. Bartee found Plaintiff was not significantly limited in his ability to remember locations and work like procedures; ability to understand and remember very short and simple instructions; ability to carry out very short and simple instructions; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to sustain an ordinary routine without special supervision; ability to work in coordination with or proximity to others without being distracted by them; ability to make simple work-related decisions; ability to interact appropriately with the general public; ability to ask simple questions or request assistance; ability to accept instructions and respond

appropriately to criticism from supervisors; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; ability to be aware of normal hazards and take appropriate precautions; ability to travel in unfamiliar places or use public transportation; and ability to set realistic goals or make plans independently of others. Dr. Bartee found Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods; ability to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and ability to respond appropriately to changes in the work setting. Dr. Bartee found Plaintiff was markedly limited in his ability to understand and remember and carry out detailed instructions (R. 371-72). Dr. Bartee found Plaintiff did not meet a listing. He found Plaintiff "retain[ed] sufficient mental capacity to perform simple 1-2 step routine and repetitive work-like activities in a low demand/pressure setting with limited expectations for social interactions with coworkers, supervisors or the general public" (R. 373).

Also on September 23, 2008, Dr. Bartee completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff had an organic mental disorder, affective disorder, and anxiety-related disorder (R. 375). Plaintiff's organic mental disorder was listed as "borderline intellectual functioning," based on the August 25, 2008, WAIS - III scores (R. 376). Plaintiff's affective disorder was listed as adjustment disorder with depressed mood, based on the June 30, 2008, mental status examination (R. 378). Plaintiff's anxiety disorder was listed as adjustment disorder with anxiety and it was based on the June 30, 2008, mental status examination (R. 380). Dr. Bartee found Plaintiff was mildly limited in his activities of daily living and ability to maintain social functioning;

Plaintiff was moderately limited in his ability to maintain concentration, persistence, or pace (R. 385).

On October 8, 2008, Plaintiff presented to Dr. Urick for medication management. Plaintiff informed Dr. Urick that Cymbalta was effective and that he was feeling "'all right, I guess.'" Dr. Urick noted Plaintiff "exhibit[ed] good dress/grooming/hygiene, ha[d] good eye contact, and exhibit[ed] no psychomotor abnormality." Plaintiff's manner was appropriate; his affect was euthymic; he mood was described as "'okay.'" Plaintiff's speech was normal as to rate, tone and content. His thoughts were goal directed; he was not delusional. His attention, concentration, and impulse control were intact; his sensorium was clear. Plaintiff's cognition was intact; his insight was partial; his judgment was good. Dr. Urick diagnosed depressive and anxiety disorders, NOS, but yet again noted that borderline intellectual functioning and mild mental retardation needed to be ruled out. Dr. Urick prescribed Cymbalta (R. 482).

On November 4, 2008, Plaintiff's counsel, Randall Galford, referred Plaintiff to Chameleon Health Care, Inc., for a psychological evaluation by Michael D. Morrello, M.S., a licensed psychologist (R. 433, 439). Mr. Morrello utilized the WAIS-III; Wide Range Achievement Test – Revision 4 ("WRAT-4"); Beck Depression Inventory – Revision Two ("BDI-II"); Beck Anxiety Inventory ("BAI"); Bender Visual Motor Gestalt Test ("BVMGT"); and clinical interview and behavior observations, and a mental status examination in his evaluation of Plaintiff (R. 433).

Plaintiff reported past work as a logger and stated that he could not work due to back pain and his inability to grasp (R. 433). Plaintiff reported he received mental health counseling for depression. He stated counseling was "helping some." Plaintiff stated he was "easily distracted" and had difficulty concentrating due to pain (R. 434). Plaintiff reported that he had been retained in

9

the third grade and left school after the ninth grade to "get a job." Plaintiff described his grades as "not very good." Plaintiff stated his relationship with his teachers was "argumentative," he did "not relate well with his classmates," and he "engaged in frequent physical fights" (R. 435).

During the mental status examination and behavior observation portion of the evaluation, Plaintiff made good eye contact. Plaintiff could recall two (2) out of three (3) words after several minutes; he could complete a "serial three-subtraction task for five steps" with one mistake; he would not spell the word "world;" he was oriented in all spheres; and he could interpret parables (R. 435). Plaintiff's affect was slightly restricted; his speech was congruent with his affect; he was conversational; his attention and concentration were slightly deficient; and he could understand and follow instructions (R. 436).

Plaintiff scored the following on the WAIS - III: verbal IQ 64; performance IQ 87; full scale IQ 72. Mr. Morrello found Plaintiff's cognitive functioning was borderline. Mr. Morrello opined that if Plaintiff were "tested repeatedly, 95 times out of 100 times, his 'true score' would fall between the Borderline range and the Mentally Handicapped range." Plaintiff scored in the mentally handicapped range in his verbal tasks and in the low average range in his performance tasks. The "significant discrepancy between his verbal IQ and performance IQ . . . suggest[ed] that [Plaintiff's] perceptual-organizational skills [were] better developed than his verbal skills." Plaintiff scored in the superior range on "tasks measuring his ability to differentiate essential from non-essential details." He scored in the mentally handicapped range on tasks "measuring his range of knowledge, abstract and concrete reasoning abilities, language development, numerical computation skills, and social judgment" (R. 436).

Plaintiff scored the following on the WRAT-4: word reading, grade score 2.2; sentence

comprehension, grade score 1.3; spelling, grade score 2.4; math computation, grade score 4.5. Mr. Morrello found Plaintiff's scores on the word reading, sentence comprehension, spelling and reading composite subtests were within the mentally handicapped range; his score on the math computation subtest was in the borderline range (R. 437).

Mr. Morrello made the following notation relative to his administering the BDI-II and BAI: "The next two evaluations were read to [Plaintiff] in an attempt to get some understanding of the psychological symptoms he may be experiencing and their severity. The interpretation of these instruments should be viewed with caution." On the BDI-II, Plaintiff's expressed depressive symptoms were found to be severe by Mr. Morrello (R. 437). On the BAI, Plaintiff's "reported anxiety symptoms that were measured within the [s]evere range" (R. 437-38). On the BVMGT, Plaintiff "produced drawings with a distinction error and an integration error," which were "not suggestive of brain damage or organicity" (R. 438).

Mr. Morrello's diagnostic impressions were as follows: Axis I – depressive disorder, NOS, and anxiety disorder, NOS; Axis II – borderline intellectual functioning; Axis III – carpal tunnel syndrome; Axis IV – vocational and economic problems; and Axis V – 50. Mr. Morrello found Plaintiff's cognitive functioning was within the borderline range. He noted that Plaintiff's "[p]rognosis for improvement [was] poor due to his low cognitive functioning and emotional problems. It [was] very unlikely that his functioning would improve to the point that he could find and maintain meaningful employment. Clinicians may find an educational approach to treatment more beneficial than an insight-oriented approach" (R. 438).

Also on November 4, 2008, Mr. Morrello completed a Medical Assessment of Ability to do Work-Related Activities (Mental) of Plaintiff. He opined the following: Plaintiff's ability to follow

11

work rules was poor; relate to co-workers was fair; deal with the public was poor; use judgment was poor; interact with supervisors was fair; deal with work stresses was poor; function independently was fair; and maintain attention and concentration was poor. Mr. Morrello's findings were based on Plaintiff's "low cognitive functioning and depressive/anxious symptoms" (R. 441). Mr. Morrello found Plaintiff's ability to understand, remember and carry out complex and detailed, but not complex, instructions was poor; Plaintiff's ability to understand, remember and carry out simple job instructions was fair (R. 441-42). Mr. Morrello found Plaintiff's ability to behave in an emotionally stable manner, relate predictably in social settings, and demonstrate reliability was poor; his ability to maintain personal appearances was fair (R. 442). Mr. Morrello found Plaintiff could manage benefits (R. 443).

On November 19, 2008, State agency reviewing psychologist Frank Roman, Ed.D., affirmed the September 23, 2008, Psychiatric Review Technique of Dr. Bartee (R. 462).

On December 31, 2008, Plaintiff presented to Dr. Urick for medication management. Plaintiff informed Dr. Urick that he had taken more Valium than prescribed and had exhausted his prescription early. Dr. Urick discussed with Plaintiff that he would "be better served by using coping skills learned in counseling." Dr. Urick noted Plaintiff "exhibit[ed] good dress/grooming/hygiene, ha[d] good eye contact, and exhibit[ed] no psychomotor abnormality." Plaintiff's manner was appropriate; his affect was broad; he mood was described as "'not too bad.'" Plaintiff's speech was normal as to rate, tone and content. His thoughts were goal directed; he was not delusional. His attention, concentration, and impulse control were intact; his sensorium was clear. Plaintiff's cognition was intact; his insight was partial; his judgment was good. Dr. Urick diagnosed depressive and anxiety disorders, NOS, and yet again noted that borderline intellectual functioning and mild

mental retardation needed to be ruled out. Dr. Urick prescribed Cymbalta (R. 473).

On May 20, 2009, Dr. Urick completed a Psychiatric Evaluation of Plaintiff. Dr. Urick noted Plaintiff was a "good historian" of his information. Plaintiff reported he was doing "'pretty good.'" Plaintiff reported Cymbalta and Diazepam were effective. Dr. Urick noted Plaintiff "exhibit[ed] good dress/grooming/hygiene, ha[d] good eye contact and no psychomotor abnormality." His manner was appropriate and his affect was broad. Plaintiff's speech was normal as to rate, tone and content. His thoughts were goal directed. His attention, concentration and impulse control were intact; his sensorium was clear. Plaintiff's cognition appeared intact; his insight was partial; his judgment was good. Plaintiff's GAF was 65. Dr. Urick continued Plaintiff's prescriptions for Cymbalta and Diazepam; encouraged Plaintiff to continue counseling; and instructed Plaintiff to return in three months (R. 554). On this occasion and subsequent reports, Dr. Urick no longer mentioned a need to rule out borderline intellectual functioning or mild mental retardation, but diagnosed only depressive disorder, NOS, currently stable, and anxiety disorder, NOS (R. 553). .

Administrative Hearing

Plaintiff testified he had a driver's license. He had failed the written test; he took the oral test (R. 40, 49). Plaintiff stated he quit school after the ninth grade to begin working. Plaintiff testified he could not read, spell or write "very good." Except for being placed in a "special reading class" in grade school, Plaintiff attended regular classes; he had no specialized education once he left school (R. 41, 49). Plaintiff testified he may have failed two grades while in school (R. 48-49).

The VE testified that Plaintiff's past work as a forklift operator, bulldozer operator and lumber stacker were semi skilled (R. 69). In his hypothetical question to the VE, the ALJ included the following limitations: ". . . able to understand and carry out simple instructions, perform simple

routine repetitive tasks, limited to low-stress jobs without production rate or pace work and no more than occasional interaction with others . . ." (R. 69).

## III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ Woody made the following findings:

1. The claimant met the insured status requirements of the Social Security Act through December 31, 2008 (R. 15).

2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b) and 416.920(b)) (R. 15).

3. The claimant has the following severe impairments: degenerative changes to lumbar spine; degenerative changes to the knees; chronic obstructive pulmonary disease; hypertension; carpal tunnel syndrome, status post left carpal tunnel release and ulnar nerve transposition; complaints of chest pain; complaints of migraine headaches; obesity; borderline intellectual functioning; and adjustment disorder with anxiety and depressed mood (20 CFR 404.1520(c) and 416.920(c)) (R. 15).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (R. 16).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of light work; must avoid exposure to temperature extremes, humidity, and environmental irritants, such as fumes, odors, and dust; is limited to the performance of unskilled work, but can carry out simple instructions and perform routine, repetitive tasks; is limited to low stress jobs with no production rate or pace work; and can have no more than occasional interaction with others (R. 20-21).

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965) (R. 25).

7. The claimant was born on October 16, 1962 and was 44 years old on the alleged disability onset date, which is defined as a younger individual (20 CFR 404.1563 and 416.963) (R. 25).

14

8.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964) (R. 25).

9.  Transferability of job skills is not material to the determination of disability due to the claimant's age (20 CFR 404.1568 and 416.968) (R. 25).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966) (R. 26).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has held that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

The Plaintiff's sole contention is:

1.  "Whether the Administrative Law Judge erred by not correctly considering whether the plaintiff met or equaled Listing 12.05(c)?" (Plaintiff's brief at p. 3)[5].

The Commissioner contends:

1.  Substantial evidence supports the ALJ's finding that Plaintiff did not meet Listing 12.05C (Defendant's brief at p. 8).

## C. Listing 12.05(c)

At step three of the evaluation, the ALJ must determine whether Plaintiff's impairments met

or medically equaled a listing. Listing 12.00 for Mental Disorders provides:

A. *Introduction.* The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months. The listings for mental disorders are arranged in nine diagnostic categories: Organic mental disorders (12.02); schizophrenic, paranoid and other psychotic disorders (12.03); affective disorders (12.04); mental retardation (12.05); anxiety-related disorders (12.06); somatoform disorders (12.07); personality disorders (12.08); substance addiction disorders (12.09); and autistic disorder and other pervasive developmental disorders (12.10). Each listing, except 12.05 and 12.09, consists of a statement describing the disorder(s) addressed by the listing, paragraph A criteria (a set of medical findings), and paragraph B criteria (a set of impairment-related functional limitations). There are additional functional criteria (paragraph C criteria) in 12.02, 12.03, 12.04, and 12.06, discussed herein. We will assess the paragraph B criteria before we apply the

---

[5]Local Rule of Civil Procedure 9.02(g), mandates the following: "<u>References to the Administrative Record</u>: Claims or contentions by the plaintiff alleging deficiencies in the Administrative Law Judge's (ALJ) consideration of claims or alleging mistaken conclusions of fact or law and contentions . . . **must include a specific reference, by page number, to the portion of the record** that (1) recites the ALJ's consideration or conclusion and (2) supports the party's claims, contentions or arguments." In his Memorandum in Support of Motion for Summary Judgment, Plaintiff failed to reference any page number within the administrative record that supported his allegations of error by the ALJ.

paragraph C criteria. We will assess the paragraph C criteria only if we find that the paragraph B criteria are not satisfied. <u>We will find that you have a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied.</u>

The criteria in paragraph A substantiate medically the presence of a particular mental disorder. Specific symptoms, signs, and laboratory findings in the paragraph A criteria of any of the listings in this section cannot be considered in isolation from the description of the mental disorder contained at the beginning of each listing category. Impairments should be analyzed or reviewed under the mental category(ies) indicated by the medical findings. However, we may also consider mental impairments under physical body system listings, using the concept of medical equivalence, when the mental disorder results in physical dysfunction. (See, for instance, 12.00D12 regarding the evaluation of anorexia nervosa and other eating disorders.)

The criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity. The functional limitations in paragraphs B and C <u>must be the result of the mental disorder described in the diagnostic description, that is manifested by the medical findings in paragraph A.</u>

<u>The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.</u> Paragraphs A and B contain criteria that describe disorders we consider severe enough to prevent your doing any gainful activity without any additional assessment of functional limitations. For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, *i.e.,* is a "severe" impairment(s), as defined in §§404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are "severe" as defined in §§404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work. Paragraph D contains the same functional criteria that are required under paragraph B of the other mental disorders listings.

(Emphasis added).

Listing 12.05 itself provides:

12.05 *Mental retardation:* <u>Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially</u>

manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

OR

B. A valid verbal, performance, or full scale IQ of 59 or less;

OR

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

OR

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

(Emphasis added).

The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV") similarly defines mental retardation as characterized by significantly subaverage intellectual functioning (an IQ of approximately 70 or below) with onset before age 18 years and concurrent deficits or impairments in adaptive functioning." Id. at 37 (emphasis added). Significantly, the DSM-IV provides that "Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning." Id. at 40. Further:

> Impairments in adaptive functioning, rather than a low IQ, are usually the presenting symptoms in individuals with Mental Retardation. Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet

the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting.

It is undisputed that Plaintiff had a valid verbal, performance, or full scale IQ of 60 through 70, as well as a physical or other mental impairment imposing an additional and significant work-related limitation of function. He therefore meets the "C" criteria of the listing. The issue is whether he meets the threshold definition of mental retardation, meaning: Did he have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period[?]"

In his decision, the ALJ made the following finding as to Plaintiff's intellectual functioning:

> Consistent with the assessment submitted by the state agency psychological consultant on September 23, 2008 (Exhibit B-8F), that was affirmed by a second consultant (Exhibits B-13F and B-14F), the claimant's mental impairments have been evaluated under Section 12.02 of Appendix 1, dealing with organic mental disorders, Section 12.04 of Appendix 1, dealing with affective disorders, and Section 12.06 of Appendix 1, dealing with anxiety-related disorders. With regard to the organic mental disorder, the claimant's representative asserted that the claimant is functionally illiterate and that he reads at the second grade level. In this regard, the claimant has reported a history of attending regular education and finishing the ninth grade (R. 16). He reported that he quit school to take a job (Exhibit B-4F). His school records establish that he made passing grades in reading, writing, spelling, and arithmetic through the seventh grade and in the eight grade he made a "B" in language and "C" in arithmetic. He made "Fs" in all classes in the ninth and tenth grades (Exhibit B-14E). Despite his alleged difficulties in this area, the claimant was able to complete the function report submitted on November 4, 2008 (Exhibit B-12E). Further, according to the testimony of the medical expert the claimant's past work operating a forklift and a bulldozer while working as a logger was semiskilled in nature

(R. 17).

> On August 25, 2008, the claimant was referred for testing by the State agency. He had I.Q. testing that resulted in verbal, performance, and full-scale scores of 64, 80, and 69, respectively. WRAT-III testing revealed that the claimant was reading at the second grade level, spelling at the first grade level, and doing arithmetic at a third grade level. At the time of this testing the claimant reported no significant deficits in his adaptive behavior during the developmental period. Based on this testing and

an earlier consultative psychological evaluation performed on June 30, 2006, Psychologist Legg opined that the claimant was functioning in the low borderline range of general intellectual functioning (Exhibit B-5F). The claimant also had testing at the time of the attorney-referred psychological evaluation on November 4, 2008. The claimant had I.Q. testing that resulted in verbal, performance, and full-scale I.Q. scores of 64, 87, and 72, respectively. The WRAT-IV testing revealed that the claimant word reading was at the 2.2 grade level, sentence comprehension 1.3 grade level, spelling at the 2.4 grade level, and math computation at the 4.5 grade level. The evaluator reported that the claimant's cognitive functioning was measured within the borderline range (Exhibit B-10F). Given the claimant's lack of impairment in adaptive functioning during the developmental period, his grades in school, and his work history, the undersigned agrees with the state agency psychological consultant (Exhibit B-8F) and finds that the claimant does not satisfy the threshold requirements of Section 12.05 of Appendix 1, dealing with mental retardation. His borderline intellectual functioning has been evaluated under Section 12.02 of Appendix 1.

(R. 17).

The undersigned finds substantial evidence supports the ALJ's conclusion that the evidence does not indicate that Plaintiff had mental retardation with significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period. The record shows Plaintiff had all "satisfactory" grades through the fifth grade. He was retained in first grade, but by fifth grade was performing at grade level in every subject listed. In 6th, 7th, and 8th grades he began receiving C's and D's, but was also absent a great deal of the time. He quit school in the 10th grade "to take a job." On standardized tests in the sixth grade, he scored no lower than a grade-equivalent 4.2 He performed better than 5-11% of the students in his grade in his school or school district.

It is true that on testing in 9th grade, Plaintiff performed better than only 1-3% of students nationally in verbal and non-verbal skills; however, he performed better than 13% in reading vocabulary, 7% in reading comprehension, and 8% in total reading; 10% in language mechanics, 2% in language expression, and 4% in spelling. He performed better than 16% of students in his grade

nationally in math. In total, he performed better than 6% of students at his grade level nationally in basic skills. While these scores are certainly low, they do not support a finding of mental retardation, and Plaintiff was never classified as mentally retarded or even having borderline intelligence in school. He attended all regular classes, as he testified, except for special help in reading.

The West Virginia Department of Health and Human Resources Medical Review Team noted on two separate occasions that Plaintiff was "literate."

Plaintiff's treating psychologist stated during every office visit that Plaintiff's cognition was intact. His intelligence was estimated as "somewhat below average." Eventually, following a Mental Status Examination, Dr. Urick discontinued using the language that "borderline intellectual functioning and mild mental retardation needed to be ruled out," and diagnosed only depressive disorder, NOS, currently stable, and anxiety disorder NOS.

Dr. Legg, an examining psychologist, diagnosed only adjustment disorder with mixed anxiety and depressed mood upon conducting a Mental Status Examination of Plaintiff. He subsequently completed an IQ assessment of Plaintiff, noting Plaintiff scored 64 verbal, 80 performance, and 69 full-scale IQ. He expressly stated, however, that Plaintiff had "reported no significant deficits in his adaptive behavior during the developmental period." Dr. Legg concluded, based on his previous mental status examination and the testing, the Plaintiff was "Most accurately described as functioning in the Low Borderline range of general intellectual functioning."

State agency reviewing psychologist Bartee found Plaintiff had an organic mental disorder, described as "borderline intellectual functioning," based on Plaintiff's test scores.

Plaintiff underwent another psychological evaluation in November 2008, upon referral by his counsel. Plaintiff scored 64 verbal, 87 performance, and 72 full scale IQ on testing. The

examining psychologist, Morello, also diagnosed Plaintiff with borderline intellectual functioning, not mental retardation. He expressly found Plaintiff's cognitive functioning was within the borderline range.

In May 2009, Plaintiff's treating psychologist, Dr. Urick, performed a psychiatric evaluation of Plaintiff. Significantly, after noting a number of times in records that borderline intellectual functioning and mild mental retardation needed to be ruled out, Dr. Urick, after the evaluation, diagnosed Plaintiff only with depressive disorder NOS, currently stable, and anxiety disorder NOS. She found his cognition intact, his insight partial, and his judgment good. A review of the record does not indicate Dr. Urick mentioned possible borderline intellectual functioning or mild mental retardation subsequent to this evaluation. Finally, Plaintiff had his teen-age daughter living with him two weeks per month without assistance, and the VE classified Plaintiff's work experience as at the semi-skilled level. This evidence is inconsistent with a finding that Plaintiff had the required deficits in adaptive functioning, or, as the DSM-IV defines it, <u>significant</u> deficits or impairments in adaptive functioning.

For all the above reasons, the undersigned United States Magistrate Judge finds that substantial evidence supports the ALJ's finding that Plaintiff did not meet Listing 12.05 for mental retardation. While Plaintiff's IQ test scores fall within the range required for Listing 12.05C, he does not meet the introductory language of Listing 12.05C in that the medical evidence of record, his own school records, and his own testimony, do not support a finding that he had mental retardation with significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period. Instead, the evidence substantially supports the ALJ's determination that Plaintiff had borderline intellectual functioning, an impairment accounted for in the ALJ's decision.

## V. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED**, the Plaintiff's Motion for Summary Judgment be **DENIED**, and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _6_ day of December , 2011.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE